UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES DEPARTMENT OF AGRICULTURE (Farm Service Agency), | CIVIL NO. 3:25-cv-1145-JAG |
| *Plaintiff*, | |
| v. | Foreclosure of Mortgage In Rem |
| CARLOS ALBERTO GONZÁLEZ RIVERA, VANESSA BERMÚDEZ CORDERO A/K/A VANESSA GONZÁLEZ RIVERA, and their Conjugal Partnership, | |
| *Defendants*, | |

**CARLOS ALBERTO GONZÁLEZ RIVERA'S
ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS,
DEMAND FOR MEDIATION, AND DEMAND FOR JURY TRIAL**

Defendant Carlos Alberto González Rivera ("Mr. González"), by and through his counsel, hereby answers Plaintiff U.S. Department of Agriculture-Farm Service Agency's ("FSA") Complaint as follows:

1.     The allegation in Paragraph 1 is a conclusion of law that requires no response.

2.     The allegation in Paragraph 2 regarding FSA's organization is a conclusion of law that requires no response. Mr. González admits that there exist two promissory notes originally issued by FSA and signed by Mr. González. Mr. González lacks knowledge or information sufficient to form a belief as to whether the notes currently affect the property described in the Complaint. Mr. González lacks knowledge or information sufficient to form a belief as to the current ownership, possession, and validity of and current amounts due on such notes and reserves the right to challenge the notes and the alleged amounts due.

3.     Admitted as to the original amount and interest rate of the May 30, 1997 promissory note. Mr. González lacks knowledge or information sufficient to form a belief as to

the current ownership, possession, and validity of and current amount due on this note and reserves the right to challenge the note and the alleged amount due. Mr. González reserves the right to challenge the accuracy of the copy filed as Exhibit 1 to the Complaint.

4. Denied. Regarding Paragraph 4, Mr. González lacks knowledge or information sufficient to confirm the validity of any alleged mortgage. Exhibit 2 to the Complaint does not provide a copy of the alleged mortgage by which to evaluate Paragraph 4.

5. Denied. Regarding Paragraph 5, Mr. González lacks knowledge or information sufficient to confirm the validity of any alleged mortgage modification. Exhibit 2 to the Complaint does not provide a copy of the alleged mortgage modification by which to evaluate Paragraph 5.

6. Admitted as to the original amount and interest rate of the May 21, 2001 promissory note. Mr. González lacks knowledge or information sufficient to form a belief as to the current ownership, possession, and validity of and current amount due on this note and reserves the right to challenge the note and the alleged amount due. Mr. González reserves the right to challenge the accuracy of the copy filed as Exhibit 3 to the Complaint. For instance, Exhibit 3 contains an incomplete case number and unchecked boxes. Mr. González also possesses records indicating that Plaintiff FSA subsequently lowered the interest rate on this promissory note to 3.5% annual interest.

7. Denied. Regarding Paragraph 7, Mr. González lacks knowledge or information sufficient to confirm the validity of any alleged mortgage. Exhibit 2 to the Complaint does not provide a copy of the alleged mortgage by which to evaluate Paragraph 7.

8.    Denied. The description in Paragraph 8 does not exactly match the description on the 1997 deed transferring the property to Mr. González. Mr. González does not know the source of the quoted language in Exhibit 2 to the Complaint.

9.    The allegation in Paragraph 9 is a conclusion of law that requires no response. To the extent a response is required, admitted that a discharge order was entered as shown in Exhibit 4 to the Complaint (ECF No. 1-4)—not Exhibit 3 as stated in the Complaint.

10.    The allegation in Paragraph 10 is a conclusion of law that requires no response. To the extent a response is required, Mr. González lacks knowledge or information sufficient to confirm the current ownership, possession, and validity of and the alleged amounts due on the promissory notes. The executed promissory notes will speak for themselves once authentic copies are confirmed by the parties. Mr. González also lacks knowledge or information sufficient to confirm the validity of any alleged mortgages.

11.    The allegations in Paragraph 11 rely on conclusions of law that require no response. To the extent a response is required, Mr. González lacks knowledge or information sufficient to confirm the accuracy or validity of the Certification of Indebtedness in Exhibit 5 to the Complaint and therefore denies this paragraph. Mr. González lacks knowledge or information sufficient to form a belief as to the current ownership, possession, and validity of and the alleged amounts due on the promissory notes and reserves the right to challenge the notes and the alleged amounts due.

12.    Denied. Regarding Paragraph 12, Mr. González lacks knowledge or information sufficient to confirm the validity of any alleged mortgages.

13.     Admitted that Mr. González is not presently active in the military service for the United States. Mr. González lacks knowledge or information regarding the military status of Defendant Vanessa Bermúdez Cordero.

## VERIFICATION

Mr. González lacks knowledge or information sufficient to form a belief as to the declaration of Mr. Edgar Maldonado Medero. Paragraphs 2 to 5 assert conclusions of law that require no response. To the extent a response is required to Paragraphs 2 to 5, denied. Paragraph 6 asserts factual conclusions based on information not currently available to Mr. González and the same is therefore denied based on lack of sufficient knowledge or information. As to Paragraph 7, denied; Mr. González has responded to the alleged authenticity and accuracy of the Exhibits to the Complaint in the paragraphs above and reserves the right to challenge them pending discovery of all available documents and all relevant facts. The Complaint does not provide copies of any alleged mortgages.

## PRAYER

The allegations contained in the PRAYER characterize the relief that FSA seeks and are conclusions of law to which no response is required. To the extent that a response is required, Mr. González denies these allegations and denies that FSA is entitled to any of the relief sought.

## <u>AFFIRMATIVE DEFENSES & COUNTERCLAIMS</u>

For his affirmative defenses and counterclaim herein, pursuant to Federal Rules of Civil Procedure 8 and 13, Defendant Carlos Alberto González Rivera hereby alleges as follows:

### Background

1.     Defendant Carlos Alberto González Rivera is a 49-year-old farmer who has owned the farmland and home in question ("the Land") since 1997. His parents gave the Land to

him and his now ex-wife so they could continue farming it. The Land is located in Utuado,

Puerto Rico and is 32 cuerdas.

2.     Mr. González is brown-skinned and Hispanic and has lived as a rural farmer on

the Land for most of his life.

3.     Mr. González currently lives on the Land and farms it. He grows chili peppers,

sweet peppers, eggplants, and citrus. He also raises cattle, sheep, and goats.

4.     The Land is Mr. González's principal residence.

5.     Mr. González received loans from the USDA Farm Service Agency ("FSA") in

the late 1990s. Mr. González made payments on those loans for many years.

6.     Based on available information and belief, Mr. González last made a payment on

his FSA loans as part of a confirmed Chapter 13 bankruptcy plan in March 2014.

7.     Mr. González filed a petition for Chapter 7 bankruptcy on April 20, 2015. USDA

did not file a proof of claim in the matter.

8.     On May 20, 2015, the trustee filed a Notice of Abandonment of Property,

abandoning the Land to Mr. González.

9.     On August 5, 2015, Mr. González received a Chapter 7 discharge.

### USDA Farm Service Agency's General Mistreatment of
### Mr. González and His Agent Ramón Gil

10.     The local FSA office has mistreated and discriminated against Mr. González and

his agent Mr. Ramón Gil.

11.     Mr. González is dyslexic and does not read or speak English. He only speaks and

reads Spanish. Due to his dyslexia, he reads with difficulty, especially dense, complex documents

and especially when under stress. FSA staff knew this because he told them in the late 1990s and

in the 2000s. In fact, his now ex-wife handled all the documents and correspondence with FSA at the time due to his dyslexia.

12.     In or around mid-2007, Mr. González went into the FSA Utuado office to ask for help understanding his rights as a borrower because (1) he did not understand the FSA notices he had received due to his dyslexia and (2) his wife was no longer helping him due to their pending divorce. The FSA staff were impatient and unhelpful. FSA staff refused to talk him through the documents and instead gave him a stack of papers and told him to sit in a corner and read the papers. Because of FSA staff's refusal to help, Mr. González did not understand his rights as an FSA borrower and did not submit a loan servicing application. Consequently, FSA began the process of accelerating Mr. González's loans in September 2007.

13.     Mr. González subsequently filed for bankruptcy multiple times as he struggled to recover financially from natural disasters that damaged his farm, all while navigating an acrimonious divorce and caring for his old and ailing parents.

14.     In or around 2015, Mr. Ramón Gil began assisting Mr. González with his farming business.

15.     Mr. Gil is a professional engineer and consultant and comes from a farming family. He assists many farmers in and around Utuado and Lares, Puerto Rico, at reduced rates or for free.

16.     Mr. Gil is openly gay.

17.     Mr. González submitted forms to FSA staff that Mr. Gil was authorized to communicate on Mr. González's behalf regarding his loans and other business with FSA.

18.     In an August 14, 2018 email, FSA Farm Loan Chief Edgar Maldonado acknowledged that Mr. Gil was authorized in writing to communicate with FSA on Mr. González's behalf.

19.     Despite FSA's knowledge of Mr. Gil's authorization, Utuado FSA loan officer María Pérez repeatedly refused to answer or even acknowledge Mr. Gil's emails and requests for telephonic or in-person meetings on behalf of Mr. González.

20.     On information and belief, María Pérez and other FSA staff ignored and dismissed Mr. Gil because of his sexual orientation and ignored and dismissed Mr. González for his association with an openly gay person.

21.     FSA staff's arbitrary refusal to interact with Mr. Gil and Mr. González prevented them from closing a voluntary sale of the Land in 2020, as described more below.

### USDA Farm Service Agency's Foreclosure Threats and Thwarting of Mr. González's Voluntary Sale of the Land

22.     In 2017, FSA mailed a Notice of Intent to Foreclose to Mr. González. The Notice was addressed to Mr. González's correct address, a PO box in Utuado.

23.     In or around August 2018, FSA mailed additional notices; however, this time FSA sent the letters to the wrong address, the address of Mr. González's neighbor. There was no basis for FSA to use the incorrect address when sending these notices, especially after having used the correct address in 2017.

24.     On or around November 8, 2018, Mr. González received the incorrectly addressed notices from his neighbors.

25.     In a letter dated December 5, 2018, Mr. González wrote back to FSA expressing his frustration that FSA was sending important notices to the wrong address, especially after he had directed the Utuado FSA office to use his PO box, the one that FSA had correctly used in the

past and was on Mr. González's official documents going all the way back to his 2001 promissory note.

26.     Mr. González's letter also requested 120 days to voluntarily sell the Land.

27.     In or around December 2018, Mr. González agreed to sell the Land to Mr. Omar Albarran for $215,000. Mr. González only agreed to sell the Land because of the foreclosure threats from FSA.

28.     The buyer Mr. Albarran needed an FSA loan to purchase the Land and submitted an application to the Utuado FSA office. FSA notified Mr. Albarran that he qualified for an FSA loan in or around March 2019.

29.     During the ensuing sale closing process, Utuado FSA loan officer María Pérez interacted almost exclusively with the buyer Mr. Albarran and refused to share information with Mr. González or his representative Mr. Gil.

30.     In or around May or June 2019, the buyer Mr. Albarran took possession of the Land as a lessee pending the sale.

31.     In or around the middle of 2019, an appraiser hired by FSA visited the Land and appraised its value at $200,000. To keep the deal intact, Mr. González agreed to lower the purchase price from $215,000 to $200,000. There is an open question as to whether this appraisal was erroneous.

32.     From March 2019 to December 2019, FSA did not report any further actions on the buyer's loan application. FSA provided no explanation for its inaction.

33.     In December 2019, FSA ran a title search and informed Mr. González and Mr. Gil that there were senior liens on the Land that needed to be addressed.

34.     Mr. González promptly addressed the liens.

35.     In or around early 2020, FSA informed Mr. Albarran that all of his loan application paperwork had been lost and that he needed to resubmit all forms and supporting documents.

36.     In or around March 2020, FSA ordered a second appraisal performed by "Fast Appraisal Services, Inc."

37.     FSA refused to share the appraisal report with Mr. González for six months. During this time, Mr. Ramón Gil inquired about the appraisal and the terms of the closing with both FSA loan officer María Pérez and FSA Farm Loan Chief Edgar Maldonado. Neither responded to Mr. Gil despite his authorization to communicate on Mr. González's behalf.

38.     On information and belief, FSA staff did not interact with Mr. Gil because he is openly gay and because he is known for advocating for FSA borrowers' rights and standing up to unfair FSA loan officers.

39.     FSA scheduled a closing for July or August 2020 but did not notify Mr. González and did not send him the new appraisal report and the final settlement account for the Land sale. Mr. González did not attend the closing because he never received formal notice of it and FSA did not provide him any of the key information to evaluate before completing the sale.

40.     FSA scheduled another closing on or around September 9, 2020. FSA shared the appraisal report for the first time via its closing attorney Mr. Pedro Anca on the afternoon of September 8, the day before the scheduled closing. Mr. González did not attend the closing due to lack of notice and inadequate time to evaluate the appraisal report.

41.     The March 2020 appraisal report, authored by "Fast Appraisal Services, Inc.," was erroneous and did not conform to industry standards. First, it described the land as "vacant" when in fact the Land had citrus trees and coffee plants on it, among other agricultural products.

Second, it compared the Land to sales from 2016, 2017, and 2019 without accounting for the significant change in market conditions over time. Third, the three "comp" properties did not remotely resemble Mr. González's Land because they were one-half to one-third of the size and not working farmland with significant income generation. Mr. González reserves the right to discover and describe other inadequacies with the appraisal.

42.     The alleged appraisal total was $188,400. FSA and the buyer were now demanding that Mr. González close for $188,400.

43.     This second, even-lower appraisal of dubious quality represented a further windfall for Mr. Albarran and a significant loss for Mr. González.

44.     Mr. González requested that a proper, industry-standard appraisal be performed. FSA refused. Instead, in a self-serving letter to Mr. Albarran, dated October 14, 2020, FSA loan officer María Pérez claimed that Mr. González was to blame for the sale not going through.

45.     On top of her homophobia, FSA loan officer María Pérez had multiple conflicts of interest in her involvement in the sale of Mr. González's Land. On information and belief, some of the support for this includes:

a.  Ms. Pérez already knew the buyer Omar Albarran personally from working closely with him when Mr. Albarran worked for the local municipality.

b.  After the Land sale fell through, María Pérez worked to facilitate a lawsuit against Mr. González. She found a lawyer to represent Mr. Albarran in a breach of contract lawsuit and offered herself as a favorable witness for Mr. Albarran against Mr. González.

c.  Ms. Pérez was friendly with Mr. González's ex-wife Ms. Vanessa Bermúdez Cordero who openly dislikes and is adverse to Mr. González. During the sale

closing period, Ms. Pérez met multiple times with Ms. Bermúdez concerning the sale of the Land.

46.     During the delays caused by FSA, the interest on outstanding mortgages and liens on Mr. González's property continued to increase.

47.     In early 2021, Mr. González found another buyer willing to pay $270,000 in cash for the Land.

48.     Mr. González's attorney Mr. Jorge Collazo contacted FSA Farm Loan Chief Edgar Maldonado to ask for a settlement statement to finalize the details of the cash sale.

49.     Mr. Maldonado had told Mr. Collazo in 2020 that FSA would be willing to reduce the interest owed on Mr. González's loans if Mr. González was able to settle the debt in cash. However, in a letter dated February 3, 2021, Mr. Maldonado contradicted his prior statement; he said no reduction in outstanding interest was possible if the sale value exceeded the alleged amounts due on FSA promissory notes.

50.     In or around May 2021, Mr. González received a letter from FSA dated May 4, 2021 that stated he qualified for loan forgiveness under Section 1005 of the America Rescue Plan Act. FSA's letter and subsequent correspondence about the anticipated loan forgiveness caused him to cease his pursuit of the sale of the Land for $270,000 cash. He decided to reinvest in the Land instead. Mr. González's reliance on FSA's promises is described more in the paragraphs below.

51.     Mr. Albarran vacated the Land in April 2021, leaving it seriously degraded. The trails were damaged. The waterways were altered and diverted. The grass was overgrown up to Mr. González's waist. The floor inside the house was damaged. The main irrigation water pump and other equipment were missing.

**USDA Farm Service Agency's Withholding of Loan Forgiveness**

52.     The American Rescue Plan Act of 2021 (Pub. L. 117-2) ("ARPA") was signed into law on March 11, 2021. Section 1005 of ARPA directed the USDA Secretary to "provide a payment in an amount up to 120 percent of the outstanding indebtedness of each socially disadvantaged farmer or rancher as of January 1, 2021, to pay off the loan directly or to the socially disadvantaged farmer or rancher (or a combination of both), on each . . . direct farm loan made by the Secretary to the socially disadvantaged farmer or rancher . . . ."

53.     On May 4, 2021, FSA mailed a letter to Mr. González in English addressing him as "Dear Borrower." The letter explained that the American Rescue Plan Act of 2021 "includes provisions for paying up to 120 percent of Farm Service Agency (FSA) direct and guaranteed loan balances as of January 1, 2021. To receive assistance under Section 1005, a borrower must belong to a socially disadvantaged group . . . [and] a socially disadvantaged borrower's FSA loans must have had an outstanding loan indebtedness on January 1, 2021." FSA's letter continued that "FSA records identify you [Mr. González] as a member of a socially disadvantaged group as defined by ARPA. As a result, you do not need to take any action at this time. FSA will contact you soon with additional information regarding the payment process. . . . If you are in bankruptcy or have been discharged of debt, this informational notice is not an attempt to collect or recover the discharged debt." Mr. Ramón Gil assisted Mr. González with understanding this letter.

54.     Sometime thereafter, FSA State Executive Director Wanda Perez presented an online webinar explaining how payments will go out to notified borrowers under ARPA § 1005. She stated that only those farmer-borrowers who had received an ARPA § 1005 letter were part

of the loan forgiveness program and that those people would receive follow-up information. Mr. Ramón Gil attended the webinar virtually.

55.     On July 28, 2021, Mr. González sent an email in Spanish to FSA employee Yvonne Nieves inquiring about the May 4, 2021 letter indicating he qualified for debt relief as a socially disadvantaged borrower ("Alivio de Deuda") and what, if any, forms he should complete. He also informed Ms. Nieves that he had begun farming again and planned on taking advantage of the offered debt relief to relaunch his farming business because it has been his passion since childhood.

56.     On July 28, 2021, Yvonne Nieves responded via email, directing Mr. González to fill out the attached form AD-2047.

57.     On July 28, 2021, Mr. González completed the AD-2047 form and sent it back to Yvonne Nieves via email.

58.     On August 24, 2021, Mr. González emailed Yvonne Nieves in Spanish stating that he would continue developing the farm while the debt relief was pending. He requested the Operation Loan application forms so he could apply.

59.     On September 21, 2021, Ramón Gil sent a letter to the FSA State Executive Director Wanda Pérez detailing the "Irregular and Questionable Sales Process of Carlos González Rivera's Farm Sale." The letter stated that "After receiving the [FSA] letter stating that his loans qualified for forgiveness in May 2021, Carlos decided against selling the farm as he only considered selling it because of the pressure to Foreclose by FSA. . . . It has been 4 months since he received the initial debt forgiveness letter and is yet to receive the second letter from FSA on the issue. He also participated with me in the webinar held by USDA where Ms. Wanda Perez explained the process and why it was taking longer than expected. . . . With this

reassurance, he decided to invest in the farm whatever little money he had been able to save from his unemployment benefits (as he worked 1 year as a landscaper in New Jersey.)"

60.    On October 14, 2021, Mr. González received a second ARPA notification, entitled "Notification to Discharged Borrower." The notice stated that "According to Farm Service Agency (FSA) records, you are eligible to receive an ARPA payment with respect to your outstanding Farm Storage Facility Loan(s) and/or eligible Farm Loan Programs direct loan(s)." The letter continued, "While all of FSA's debt has been discharged before January 1, 2021, FSA security still remains. FSA will release its security instruments once it is permitted to do so. Lawsuits have been filed against USDA, which have stopped releases from being made at this time."

61.    President Biden signed the Inflation Reduction Act ("IRA") into law on August 16, 2022. Section 22006 of the Inflation Reduction Act of 2022 (Pub. L. 117-169) replaced ARPA § 1005, which was repealed by IRA § 22008. Section 22006 appropriated $3.1 billion to pay off outstanding debts owed by "distressed borrowers of direct or guaranteed loans administered by the Farm Service Agency." It directed the USDA Secretary to "provide relief to those borrowers whose agricultural operations are at financial risk as expeditiously as possible, as determined by the Secretary."

62.    In a press release dated October 18, 2022, USDA announced that "Approximately 11,000 delinquent direct and guaranteed borrowers had their accounts brought current. USDA also paid the next scheduled annual installment for these direct loan borrowers[,] giving them peace of mind in the near term. . . . USDA is also initiating two case-by-case processes to provide additional assistance to farm loan borrowers. Under the first new process, FSA will

review and assist with delinquencies from 1,600 complex cases, including cases in which borrowers are facing bankruptcy or foreclosure."

63.     Earlier in 2022, then-FSA Administrator Zach Ducheneaux had sent a January 31, 2022 letter to Mr. González labeling him as a "distressed borrower."  Like the ARPA letters to Mr. González in 2021, the letter addressed Mr. González as "Dear Borrower." The letter also stated that "[a] separate letter will be sent out soon that will more fully explain the loan servicing options available to you as a direct loan borrower."

64.     Despite FSA's multiple communications in 2021 and 2022 indicating that Mr. González qualified for debt relief as a "borrower," he never received any loan forgiveness, debt relief, or related payments from FSA under either ARPA § 1005 or IRA § 22006.

65.     Mr. González relied on FSA's communications that he qualified for forthcoming debt relief. Based on that reliance, he ceased pursuit of the sale of the Land for $270,000 cash in 2021 and instead invested significant time and money back into the Land to relaunch his farming business, which continues to this day.

**USDA's Discrimination Financial Assistance Program**

66.     Section 22007 of the Inflation Reduction Act directed USDA "to provide financial assistance . . . to farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs."

67.     Mr. González submitted an application to this program.

68.     The third-party administrators determined that Mr. González had experienced discrimination in USDA lending programs and awarded him $109,000.

69. Relying on FSA's promises of complete debt relief, Mr. González has used a large majority of that discrimination award to improve and revitalize the farming operation on the Land.

70. In or around February 2025, Mr. Ramón Gil spoke with FSA State Executive Director Wanda Pérez on the telephone. Mr. Gil told Ms. Pérez that Mr. González was reinvesting back into the Land. Ms. Pérez told Mr. Gil that FSA was there to help Mr. González and to call her anytime. She did not mention any impending foreclosure action or demand payment to avoid foreclosure. This occurred just one month before FSA filed its Complaint.

**FIRST AFFIRMATIVE DEFENSE – FAILURE TO STATE A CLAIM**

71. The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

72. The Complaint fails to state a claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE – RECOUPMENT**
**(Promissory estoppel)**

73. The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

74. The conduct of FSA and its employees estopps it from foreclosing on any valid mortgages and otherwise claiming any amounts allegedly owed under any promissory notes or mortgages in this case.

75. FSA promised loan forgiveness to Mr. González on all outstanding debt. Mr. González's reliance on this promise was foreseeable, and he reasonably relied on the promise. In fact, he explicitly conveyed to FSA employees his plans to rely on the promise, and FSA employees never advised him that he was wrong to do so.

76.     Because of FSA's promise of loan forgiveness, Mr. González declined a cash offer of $270,000 for his Land. Instead, he chose to invest substantial amounts of time, money, and resources into his Land to rebuild the farming operation.

77.     This Court should enter a declaration or injunction that ensures Defendant is delivered FSA's promised debt relief to avoid the injustice of foreclosure and the resulting loss of the Land and Mr. González's substantial investments in it.

**THIRD AFFIRMATIVE DEFENSE – RECOUPMENT**
**(Negligent Misrepresentation and/or Omission regarding Loan Forgiveness)**

78.     The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

79.     As described above, FSA's actions were done with lack of reasonable care or competence with regard to obtaining and/or communicating the truth of the facts regarding the status of the loan forgiveness promised to Mr. González.

80.     As a direct and proximate cause of FSA's conduct, Mr. González has suffered monetary damage, anxiety, mental suffering, and emotional distress, all to his damage in an amount to be determined by the evidence at trial. As a direct and proximate result of FSA's misconduct, Mr. González is entitled to an award of compensatory damages in the form of recoupment that would offset any obligation that FSA alleges in its Complaint.

**FOURTH AFFIRMATIVE DEFENSE – RECOUPMENT**
**(Negligent or Intentional Interference with Land Sales)**

81.     The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

82.     On information and belief, FSA employees negligently or intentionally interfered with Mr. González's attempts to voluntarily sell the Land between 2018 and 2021.

83.    As a direct and proximate cause of FSA's conduct, Mr. González has suffered monetary damage, anxiety, mental suffering, and emotional distress, all to his damage in an amount to be determined by the evidence at trial. As a direct and proximate result of FSA's misconduct, Mr. González is entitled to an award of compensatory and punitive damages in the form of recoupment that would offset any obligation that FSA alleges in its Complaint.

## FIFTH AFFIRMATIVE DEFENSE – RECOUPMENT
### (Breach of duty to assist)

84.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

85.    On information and belief, FSA employees had a duty to assist Mr. González with understanding his loan servicing notices in 2007, especially in light of his known dyslexia disability. *See, e.g.*, 7 C.F.R. § 15d.2 (2007) (USDA policy on nondiscrimination).

86.    FSA employees breached their duty by refusing to help Mr. González. Instead, they handed him a stack of papers and told him to read them, even though he is dyslexic and expressed that his disability was preventing him from understanding the notices.

87.    As a direct and proximate cause of FSA's conduct, Mr. González has suffered monetary damage, anxiety, mental suffering, and emotional distress, all to his damage in an amount to be determined by the evidence at trial. As a direct and proximate result of FSA's misconduct, Mr. González is entitled to an award of compensatory and punitive damages in the form of recoupment that would offset any obligation that FSA alleges in its Complaint.

## SIXTH AFFIRMATIVE DEFENSE – LACHES

88.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

89.    FSA's claims are barred by the doctrine of laches.

90.     FSA has demonstrated a lack of diligence in communicating with Mr. González and asserting any rights it has under any valid mortgages. Mr. González's last payment was in March 2014, and Mr. González received a Chapter 7 discharge in August 2015. It has been nearly ten years since. FSA's last demand for payment was foreclosure notices sent in 2017 or 2018. After FSA employees thwarted a voluntary sale in 2020, FSA sent correspondence to Mr. González in May and September 2021 that any outstanding mortgage obligations would be forgiven.

91.     FSA's delay and promises of debt relief prejudiced Mr. González because he relied on FSA's commitment to forgiving all outstanding debt and its apparent abandonment of any valid mortgages and changed his position materially by (1) foregoing a $270,000 cash sale of the Land and (2) reinvesting substantial time, money, and resources back into the farm and his home on the Land.

92.     As recent as February 2025, FSA State Executive Director Wanda Pérez expressed a desire to help Mr. González with his reinvestment in the Land and did not make any claim for payment, nor mention any impending foreclosure action.

## SEVENTH AFFIRMATIVE DEFENSE
## UNCLEAN HANDS & EQUITABLE ESTOPPEL

93.     The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

94.     FSA's claims are barred by the doctrine of unclean hands and equitable estoppel.

95.     FSA has demonstrated bad faith and malice towards Mr. González. In the past, FSA employees dismissed Mr. González's requests for assistance regarding understanding his rights as a borrower and just handed him a stack of papers and told him to read them, despite knowing that he is dyslexic and was having trouble reading and understanding.

96.     FSA employees have often refused to interact with Mr. González's designated agent, Ramón Gil, despite the submission of multiple authorization forms to FSA. Ramón Gil is openly gay. FSA employees have dismissed and mistreated both Mr. Gil and Mr. González based on homophobia and on Mr. Gil and Mr. González advocating for their rights and the rights of other FSA borrowers.

97.     FSA employees have repeatedly sent important correspondence to incorrect addresses, despite having Mr. González's correct address on file.

98.     When Mr. González attempted to sell the Land voluntarily, FSA employees slow-walked the loan process for the buyer and refused to share key sale documents with Mr. González and Mr. Gil for over six months. FSA ordered appraisals of dubious quality that artificially deflated the value of the Land. The lead FSA loan officer handling that sale, María Pérez, has demonstrated homophobia and had substantial conflicts of interest. An FSA employee also conveyed to Mr. González's attorney false information about cash settlement options for the outstanding interest on promissory notes.

99.     Mr. González ultimately declined to sell the Land because FSA sent notice to him and gave further assurances that FSA would forgive his loans completely. As he informed FSA in 2021, Mr. González relied on these promises in deciding to not sell the Land and instead to invest substantial time, money, and resources back into the farm and his home. Yet FSA never forgave any of Mr. González's alleged outstanding debt.

**EIGHTH AFFIRMATIVE DEFENSE – HOMESTEAD PROTECTION**

100.     The Land is the principal residence of Mr. González and therefore protected by applicable homestead laws.

## NINTH AFFIRMATIVE DEFENSE – ABANDONMENT

101.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

102.    FSA abandoned its security interest in the Land by (1) thwarting Mr. González's attempts to voluntarily sell the Land, (2) promising complete debt relief on any promissory notes and mortgages, and (3) not acting on its foreclosure rights for ten years.

## TENTH AFFIRMATIVE DEFENSE – DUTY TO SELL ON OPEN MARKET

103.    The equity in Mr. González's property adequately secures any alleged mortgages held by FSA. As alleged mortgagee, FSA has a fiduciary duty and a duty of good faith and diligence to protect the equity that exceeds the total alleged debt.

104.    In the alternative to Mr. González's other defenses and counterclaims, FSA should be enjoined from foreclosure and auction on the condition that Mr. González expeditiously sell the Land on the open market to recover the full value of the Land and all equity exceeding any amounts that this Court finds due on any valid mortgages after recoupment and other defenses are applied.

## ELEVENTH AFFIRMATIVE DEFENSE – LIMIT ON COSTS AND FEES

105.    Pursuant to Puerto Rico statute 30 L.P.R. § 2701, the Land is only liable for costs and fees to the extent specified in any valid mortgages.

## TWELFTH AFFIRMATIVE DEFENSE

106.    Defendant Carlos Alberto González Rivera hereby reserves the right to assert additional defenses that may be pertinent to FSA's claims when the precise nature of said claims is ascertained through discovery and based upon the facts developed as this matter progresses.

<u>**COUNTERLAIMS**</u>

**JURISDICTION AND VENUE**

107.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

108.    This Court has subject-matter jurisdiction over these counterclaims and any affirmative defenses deemed counterclaims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

109.    Venue in this district is proper pursuant to 28 U.S.C. § 1391 because Plaintiff may be found in this District and Defendant Carlos González resides in this District. Moreover, by virtue of bringing this action, Plaintiff has waived any venue objections to Defendant's counterclaim.

**FIRST CLAIM – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**(IRA § 22006 Loan Forgiveness)**

110.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

111.    Plaintiff is an "agency" under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).

112.    The APA requires that a court "(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706.

113.    On information and belief, USDA has completed issuing all loan forgiveness and/or payments to cover outstanding loan payments to FSA borrowers under IRA § 22006. USDA's decision not to extend loan forgiveness to either Mr. González or his codefendant Ms.

Vanessa Bermúdez Cordero or otherwise pay off any alleged outstanding mortgage obligations is a final agency action under 5 U.S.C. § 551(13).

114.    Mr. González and codefendant Vanessa Bermúdez Cordero fall within the category "distressed borrowers," and therefore qualify for loan forgiveness and/or payments under IRA § 22006. Yet neither Mr. González nor Ms. Bermúdez have received any loan forgiveness or payments from USDA, despite tens of thousands of other distressed FSA borrowers receiving such assistance.

115.    The withholding of loan forgiveness and/or loan payments from Mr. González and Ms. Bermúdez is arbitrary and capricious, contrary to IRA § 22006, and an abuse of discretion.

## SECOND CLAIM – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### (Failure to provide loan servicing notification)

116.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

117.    On information and belief, in 2007, FSA refused to assist Mr. González with understanding his loan servicing notices in response to his request for such help due to dyslexia.

118.    FSA's decision to not provide assistance was a final agency action under 5 U.S.C. § 551(13).

119.    FSA's decision violated 7 U.S.C. § 1981d and was otherwise arbitrary and capricious and an abuse of discretion.

[continued on next page]

### THIRD CLAIM – VIOLATION OF FIFTH AMENDMENT OF U.S. CONSTITUTION
### (Inadequate notice of loan servicing)

120.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

121.    FSA's failure to assist Mr. González with understanding the loan servicing notices in 2007 was a violation of Mr. González's procedural due process rights under the Fifth Amendment of the United States Constitution.

### FOURTH CLAIM – VIOLATION OF EQUAL CREDIT OPPORTUNITY ACT

122.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

123.    Under 15 U.S.C. § 1691(a), it is "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age . . . ."

124.    Under 15 U.S.C. § 1691a, FSA is a "creditor," and Mr. González is an "applicant."

125.    Mr. González's attempted voluntary sale of the Land in response to threat of foreclosure was an "aspect of a credit transaction," 15 U.S.C. § 1691(a).

126.    On information and belief, FSA staff discriminated against Mr. González and his authorized agent Mr. Ramón Gil on the basis of sexual orientation (sex), race, color, or national origin during Mr. González's attempts to voluntarily sell the Land.

127.    As a direct and proximate cause of FSA's conduct, Mr. González has suffered monetary damage, anxiety, mental suffering, and emotional distress, all to his damage in an amount to be determined by the evidence at trial.

## DEMAND FOR JURY TRIAL

Defendant Carlos Alberto González Rivera hereby requests a trial by jury consistent with applicable law.

## DEMAND FOR MEDIATION

Defendant Carlos Alberto González Rivera hereby requests compulsory mediation pursuant to Puerto Rico law governing foreclosures on principal residences, 32 L.P.R. § 2882. The Land is his principal residence.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Carlos Alberto González Rivera respectfully demands the following relief from the Court:

(1) Entry of judgment in favor of Defendant Carlos Alberto González Rivera that finds any valid FSA mortgages on the Land fully satisfied and dismisses FSA's claims in their entirety with prejudice;

(2) The award of damages of an amount determined by the evidence at trial caused by FSA's violation of the Equal Credit Opportunity Act;

(3) In the alternative,

    a. An injunction requiring FSA to credit to Mr. González the value of any and all delinquent payments on principal and interest, plus one additional annual installment payment, due on any valid promissory notes and related mortgages related to the Land; and/or

    b. Recoupment totaling the value of any and all delinquent payments on principal and interest, plus one additional annual installment payment, due on

any valid promissory notes and mortgages related to the Land of Mr. González; and/or

c. An injunction requiring FSA to extend all loan servicing options inadequately noticed to Mr. González in the past with assurances that FSA will treat Mr. González as if a non-discharged borrower, consistent with applicable FSA regulations and all applicable appeal rights; and/or

d. A temporary stay of foreclosure for four years that directs Mr. González to expeditiously redeem the Land or sell it on the open market, (1) with full and good faith cooperation from FSA, and (2) with proceeds being split between FSA and Mr. González consistent with this Court's decision about total amounts due as reduced by recoupment and all other defenses.

(4) Attorney's fees, interest, and costs of suit incurred herein to the full extent authorized by law; and

(5) Any other relief the Court deems just and equitable.

Dated: May 29, 2025

Respectfully submitted,

José Ernesto Colón Villafañe

JOSÉ ERNESTO COLÓN VILLAFAÑE
USDC-PR No. 308712
PO Box 4024
San Juan, Puerto Rico 00902-4024
EMAIL: info@foodandfiberlaw.com
TELEPHONE: (787) 505-3389